**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

———————————————————————

| | |
|---|---|
| ERIC BARKWELL and GARY MASSEY, on behalf of themselves and all other similarly situated persons,<br><br>            Plaintiffs,<br><br>v.<br><br>SPRINT COMMUNICATIONS COMPANY, L.P., SPRINT NEXTEL CORPORATION, SPRINT SOLUTIONS, INC., and SPRINT SPECTRUM, L.P.,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION FILE

NO. 4:09-CV-56 (CDL)

———————————————————————

## PLAINTIFFS' AND CLASS COUNSEL'S MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT, APPLICATION FOR INCENTIVE AWARDS, AND APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

After three and a half years of hard-fought litigation, Class Counsel negotiated the Class Action Settlement ("Settlement" or "Agreement") (Dkt. No. 78-1) with Defendants Sprint Communications Company, L.P., Sprint Nextel Corporation, Sprint Solutions, Inc., and Sprint Spectrum, L.P. (collectively, "Sprint").[1]  The Settlement – which consists of Prospective Relief in the form of revisions to Sprint's customer contracts and disclosures; Cash or Non-Cash Benefits ("Settlement Benefits") to members of the Fee Notice Sub-Class; plus Sprint's payment of attorneys' fees, incentive awards, and all expenses associated with Class Notice and Claims administration – is an outstanding achievement that will provide immediate and future benefits to the Settlement Class without further risks, delays, and costs.  See generally Joint Declaration of E. Adam Webb and Matthew C. Klase ("Joint Decl.") (Exh. A hereto).  The Settlement, which

---

[1] All capitalized defined terms used herein have the same meanings ascribed in the Agreement.

the parties negotiated under the supervision of respected mediators Art Glaser and R. William Roland, is an "excellent" result for Class Members.  See Declaration of Sean R. Smith ¶ 19 ("Smith Decl.") (Exh. B hereto).

Plaintiffs Eric Barkwell and Gary Massey and Class Counsel now seek Final Approval of the Settlement.  Based on the controlling legal standards and the supporting facts, Final Approval is clearly warranted.   In addition, Class Counsel respectfully request that the Court approve Incentive Awards to the two named Plaintiffs, whose willingness to represent the Settlement Class and active participation in the Action helped make possible the Settlement.  Finally, Class Counsel respectfully request that the Court award attorneys' fees representing, at a maximum, 21.74% of the Settlement Benefits to compensate them for their work in achieving the Settlement.

## I.     INTRODUCTION

This Action was brought on behalf of Sprint customers who were assessed Sprint Surcharges that were not properly disclosed and/or authorized by their wireless services agreements.  Agreement p. 2; also Joint Decl. ¶ 5.  According to Plaintiffs, these practices violated Sprint's contractual and good faith duties, were substantively and procedurally unconscionable, and resulted in unjust enrichment to Sprint.   Joint Decl. ¶ 5.   Sprint denied liability and vigorously defended the Action.  Id. at ¶ 6.

Plaintiffs and Class Counsel litigated the cases for several years.  The litigation was hard fought; the parties engaged in significant motion practice and discovery.  Id. at ¶¶ 10-28.  The case involves sharply opposed positions on several fundamental legal issues.  Id. at ¶ 3.  The parties arrived at a Settlement only after vigorous arms-length negotiations conducted by experienced counsel under the supervision of two mediators.  Joint Decl. ¶¶ 24, 28-31.

Under the Settlement, *millions* of Settlement Class Members will automatically receive important Prospective Relief in the form of revisions to Sprint's disclosures and wireless services agreements.  Agreement § II(A).  These practice changes are critical to not only clarify the nature and details of Sprint Surcharges, but to inform and/or remind Settlement Class Members to consult their Sprint contract, which gives them options in the event Sprint materially changes the Surcharges in the future.  Joint Decl. ¶¶ 39-41; Revised Disclosures & Notices (Dkt. No. 78-9).  Moreover, the approximately 2.3 million members of the Fee Notice Sub-Class will have the right to file a Claim to obtain Cash or Non-Cash Settlement Benefits.  Id. at § II(B).  Finally, Sprint has agreed to pay all attorneys' fees and incentive awards, as well as all expenses incurred in connection with the administration of the Notice and Claims programs and the Settlement.  Id. at § V(A)-(D).

Accordingly, Plaintiffs and Class Counsel respectfully request that the Court: (1) grant Final Approval to the Settlement; (2) certify for settlement purposes the Settlement Class pursuant to Rule 23(b)(3) and (e) of the Federal Rules of Civil Procedure; (3) appoint Eric Barkwell and Gary Massey as class representatives; (4) appoint E. Adam Webb and Matthew C. Klase as Class Counsel; (5) approve Incentive Awards to Mr. Barkwell and Mr. Massey; (6) award Class Counsel attorneys' fees and expenses, pursuant to Rule 23(h) of the Federal Rules of Civil Procedure; and (7) enter Final Judgment dismissing the Action with prejudice.

## II.   MOTION FOR FINAL APPROVAL

### A.   Procedural Background

#### 1.   Complaint and Preliminary Discovery and Motion Practice

In April 2009, Plaintiff Eric Barkwell filed this case in Muscogee County Superior Court seeking monetary damages, restitution, and declaratory relief, and challenging Sprint's

disclosure and assessment of Sprint Surcharges. <u>See generally</u> Complaint (Dkt. No. 1-1). Plaintiff's primary theory was that Sprint did not provide sufficient notice of Sprint Surcharges prior to locking its customers into long term agreements and that, after customers discovered they were liable for such Surcharges, they could not cancel their agreements without incurring a large Early Termination Fee ("ETF"). Complaint, ¶¶ 9, 14; Joint Decl. ¶ 8.

Sprint subsequently removed the case to this Court and filed its Answer. Notice of Removal (Dkt. No. 1); Answer (Dkt. No. 1-3). In its Answer, Sprint denied all wrongdoing and asserted 23 separate affirmative defenses, including the voluntary payment doctrine and that its disclosure of Sprint Surcharges is adequate and the Surcharges are expressly allowed by its customer contracts. Answer, p. 6.

Mr. Barkwell immediately served detailed written discovery requests on Sprint. Joint Decl. ¶ 10. Sprint responded to Plaintiff's discovery requests, producing a substantial amount of responsive documentation. <u>Id.</u> Class Counsel's review and understanding of this documentation, which consisted in large part of the disclosures Sprint provides its customers concerning Sprint Surcharges, as well as the numerous contract documents authorizing Sprint Surcharges, was critical to Class Counsel's evaluation of Mr. Barkwell's claims and the likelihood of prevailing. Joint Decl. ¶¶ 59, 64-65.

On September 16, 2009, Sprint filed a motion for judgment on the pleadings, attacking the sufficiency of Mr. Barkwell's allegations. Dkt. No. 7. Plaintiff opposed (Dkt. No. 9) and Sprint filed a reply (Dkt. No. 10). Plaintiff also filed a motion to strike Sprint's reply (Dkt. No. 14), which Sprint opposed (Dkt. No. 17), and to which Plaintiff replied (Dkt. No. 24).

While the motion for judgment on the pleadings was pending, Sprint continued its vigorous defense by filing a motion to deny class certification. Dkt. Nos. 11, 13. Therein, Sprint

contended that (i) many of the proposed class members had released their claims in prior class-wide settlements involving Sprint Surcharges, (ii) individualized factual issues would predominate, and (iii) because each customer's contract is governed by the law of the state where the agreement was entered, the laws of all 50 states would apply to a nationwide class, and variations in each state law would predominate. Id. Plaintiff opposed this motion (Dkt. No. 20), Sprint submitted a reply (Dkt. No. 22), and Plaintiff, after obtaining Court permission, filed a surreply (Dkt. No. 26). Sprint also submitted a notice of supplemental authority in support of its motion (Dkt. No. 30) and Plaintiff responded thereto (Dkt. No. 31).

While these motions were pending, the parties were embroiled in significant discovery disagreements. Joint Decl. ¶ 13. Sprint moved the Court to stay discovery, contending the pending dispositive motions were purely legal in nature. Dkt. No. 12. Plaintiff opposed this effort. Dkt. No. 19. Meanwhile, Plaintiff contended Sprint did not produce all responsive documents, and after meet and confer efforts failed, filed a motion to compel. Dkt. No. 15. Sprint opposed this motion (Dkt. No. 18) and Plaintiff replied (Dkt. No. 27).

On January 25, 2010, Mr. Barkwell and Class Counsel moved the Court for leave to file an amended complaint. Dkt. Nos. 29. Such an amendment was necessary not only to add Plaintiff Gary Massey and various Defendant Sprint entities to the case, but to clarify the factual and class allegations based on information that had been uncovered during discovery and through Class Counsel's continued investigation. Joint Decl. ¶ 14. Sprint opposed this request (Dkt. No. 32) and Plaintiff replied (Dkt. No. 36).

By this time, Plaintiff had served additional written discovery requests and Sprint had produced supplemental responses and information. Joint Decl. ¶ 15. Plaintiff again questioned the completeness of Sprint's responses and, after meeting and conferring, filed a second motion

to compel on February 15, 2010.  Dkt. No. 33.  Sprint opposed this motion (Dkt. No. 37) and Plaintiff replied (Dkt. No. 38).

On March 25, 2010, the Court issued an order granting Sprint's motion to stay further discovery and granting leave to Plaintiff to file a surreply brief in conjunction with Sprint's motion for judgment on the pleadings.  Text Order.  Plaintiff thereafter submitted this brief.  Dkt. No. 39.

On May 5, 2010, following a lengthy hearing, the Court granted Plaintiff's request to file an amended complaint and denied all other pending motions as moot.  Dkt. No. 40.

2.    First Amended Complaint and Subsequent Motion Practice

On May 11, 2010, Plaintiffs Eric Barkwell and Gary Massey filed their First Amended Complaint.  Dkt. No. 41.  Therein, Plaintiffs greatly refined and reduced the scope of their allegations to seek relief on behalf of two classes of current and former Sprint consumer customers:  (i) those who paid Sprint Surcharges in an amount that was greater than specified in their customer agreements and (ii) those who paid Sprint Surcharges in an amount that exceeded Sprint's actual "costs associated with governmental programs."  Dkt. No. 41, ¶ 46.

On May 25, 2010, Sprint filed its Answer, denying Plaintiffs' allegations of wrongdoing and asserting 29 affirmative defenses, including the voluntary payment doctrine.  Answer to First Amended Complaint, p. 8.

On July 21, 2010, Sprint filed a motion for summary judgment arguing primarily that the language of its wireless services agreements gave it complete discretion to change the amounts and/or nature of Sprint Surcharges.  Dkt. No. 44.  Sprint specifically argued that the agreements did not limit Sprint Surcharges to recoupment of only costs and fees associated with governmental programs.  Id.  Sprint also claimed that the voluntary payment doctrine barred

Plaintiffs from recovery. <u>Id.</u> Plaintiffs primarily opposed on the ground that Sprint's interpretation of its customer agreements failed as a matter of law. Dkt. No. 47. Plaintiffs also argued that the voluntary payment doctrine defense was inapplicable for a variety of reasons, including that there was no evidence Plaintiffs actually paid the Surcharges in dispute.[2] <u>Id.</u> Sprint thereafter filed a reply brief. Dkt. No. 51. Plaintiffs, after obtaining Court permission, filed a surreply. Dkt. No. 53.

On December 6, 2010, the Court issued an Order denying Sprint's motion for summary judgment. Dkt. No. 56. The Order found that the 2007 version of the wireless services agreement terms and conditions mandated that Sprint Surcharges be tied to "government costs or costs of complying with government programs," but the 2008 version did not. <u>Id.</u> at 12-15. The Court further noted that both versions allowed Sprint to change the amount of Sprint Surcharges <i>if</i> notice was provide to the customer. <u>Id.</u> The Order ultimately found that there were triable issues of fact as to which version governed the Plaintiffs' claims. <u>Id.</u> at 15-21.

Thereafter, discovery recommenced on the factual issues which remained live following the Court's Order, namely whether (i) the Sprint Surcharges imposed on customers while the 2007 agreement was in effect exceeded Sprint's "government costs or costs of complying with government programs" and (ii) Sprint provided proper notice of Surcharge increases to its customers. Joint Decl. ¶ 23; Dkt. No. 56. Class Counsel prepared written discovery requests directed to Sprint on these refined issues. Joint Decl. ¶ 23.

---

[2] Plaintiffs also moved to strike the summary judgment motion as exceeding the scope of the Court's May 5, 2010 Order (Dkt. No. 45), a motion which Sprint opposed (Dkt. No. 46), and to which Plaintiff replied (Dkt. No. 49). The parties also filed additional briefing as to the proper scope of the motion for summary judgment. Dkt. Nos. 54 and 55.

3.       Settlement Discussions Commence But Are Derailed by *Concepcion*

In early 2011, the parties agreed to commence class-wide settlement discussions.  Joint Decl. ¶ 24.  On February 16, 2011, the parties attended a full day of mediation with mediator Arthur Glaser of Henning Mediation.  Id.  Progress was made as the framework of a deal was negotiated, however, no final agreement was ultimately reached.  Id.  Nonetheless, the parties agreed to continue discussions, notified the Court of their progress, and requested a formal stay while negotiations continued.  Dkt. No. 59.  The Court granted this request (Dkt. No. 60) and thereafter the parties continued to negotiate, exchanging emails and calls, and meeting in person to progress the discussions.  Joint Decl. ¶ 24.

In May 2011, the Supreme Court's decision in AT&T Mobility LLC v. Concepcion, __ U.S. __, 131 S. Ct. 1740 (2011), was released.  Sprint viewed this favorable decision on the enforceability of arbitration clauses as a means to extricate itself from the litigation and broke off settlement discussions, which had advanced substantially.  Joint Decl. ¶ 25.

On June 9, 2011, Sprint moved to enforce the arbitration provision in its standard customer agreements.  Dkt. No. 63.  Plaintiffs opposed on the ground that Sprint had waived its right to pursue arbitration by actively participating in the litigation.  Dkt. No. 64.  Sprint thereafter submitted its reply (Dkt. No. 65) and Plaintiffs filed a notice of subsequent authority (Dkt. No. 66).  Pursuant to an earlier order of the Court, litigation was stayed while this motion was considered.  Dkt. No. 62.

On January 12, 2012, this Court denied Sprint's motion to compel arbitration on waiver grounds.  Dkt. No. 67.  Sprint thereafter appealed this decision to the Eleventh Circuit Court of Appeals (Dkt. No. 68), and this Court stayed the case pending the outcome of the arbitration appeal (Dkt. No. 72).

4.      <u>Settlement Discussions Recommence and Agreement Is Reached</u>

In March 2012, Sprint filed its initial appellate brief in the Court of Appeals.  Joint Decl. ¶ 28.  The appeal was subsequently referred to mediation by R. William Roland of the Eleventh Circuit's Kinnard Mediation Center.  <u>Id.</u>

On April 17, 2012, the parties attended their first session of mediation with Mr. Roland. Joint Decl. ¶ 29.  Discussions resumed where they left off in May 2011 prior to Sprint unsuccessfully moving to compel arbitration.  <u>Id.</u>  The parties did not reach a final agreement at the conclusion of the session but agreed to keep working.  <u>Id.</u>  Any agreement was to be conditioned on Sprint providing confirmatory discovery proving that the Surcharges it imposed on its customers were less than its government-related costs.  <u>Id.</u>

For the next several months, the parties exchanged many emails and calls.  <u>Id.</u> at ¶ 30. The parties continued to make progress although, given the corporate structure of Sprint, and more specifically the number of individuals who needed to review and comment on the settlement, negotiations were slow going.  <u>Id.</u>

On October 2, 2012, the parties met again to finalize the terms of a Memorandum of Agreement ("MOA").  Joint Decl. ¶ 31.  This meeting was successful and after a few more months of tinkering, on December 10, 2012, the parties executed the MOA evidencing an agreement in principle to settle this litigation on a class-wide basis.  <u>Id.</u>

On December 17, 2012, the Eleventh Circuit stayed proceedings in the appeal for a period of 120 days to allow the parties to finalize the open issues identified in the MOA, complete confirmatory discovery, execute a final settlement agreement, and obtain preliminary and final approval from this Court.  <u>Id.</u> at ¶ 32.  The Eleventh Circuit thereafter granted several additional stays in order to facilitate the completion of these tasks.  <u>Id.</u>

During the stay periods, the parties kept in close contact and worked together to resolve the open issues.  For example, the parties revised certain notice and disclosure language at issue in this lawsuit.  Id. at ¶ 33.  In addition, a third party auditor conducted a thorough review of Sprint's records for confirmatory discovery purposes.  Id.  The parties also performed additional work to finalize the settlement, including holding many conference calls and exchanging hundreds of drafts and emails in an effort to finalize the details of the Agreement and related documents.  Id.

On August 22, 2013, the parties moved to lift the stay so (i) a stipulated protective order governing confirmatory discovery could be entered and (ii) the parties could seek preliminary approval of the Settlement.  Dkt. Nos. 75, 76.  On August 23, 2013, this Court lifted the stay and entered the stipulated protective order.  Dkt. No. 77.

The audit report and additional confirmatory discovery requested by Class Counsel was subsequently exchanged.   Joint Decl. ¶ 35.   On October 8, 2013, the parties executed the Agreement.  Id.

On October 9, 2013, Plaintiffs and Class Counsel filed their motion for preliminary approval.  Dkt. No. 78.  On October 10, 2013, this Court entered an Order granting preliminary approval to the Settlement, certifying the Settlement Class, and scheduling a final approval hearing for April 10, 2014.  Dkt. No. 79.

**B.**     **Summary of the Settlement Terms**

The Settlement's terms are detailed in the Agreement.  Dkt. 78-1.  The following is a summary of the material terms:

1.     The Settlement Class and Sub-Class

The Settlement Class is an opt-out class under Rule 23(b)(3) of the Federal Rule of Civil Procedure.  The Settlement Class is defined as:

> All Persons in the United States or the U.S. territories, who are or were parties to an Individual Liable Account with Sprint for wireless services between January 1, 2007, and the date of this Agreement and who were charged or were subject to Sprint Surcharges on any or all wireless lines of service.  The Settlement Class does not include governmental or corporate accounts.

Agreement § I(LL).

Additionally, there is a Sub-Class, the "Fee Notice Sub-Class," which is defined as "Persons holding Individual Liable Accounts who were subject to Sprint Surcharges and who did not receive notice of Sprint Surcharge increases."  It is not possible to define that Sub-Class precisely by date, but Sprint has identified each of the approximately 2.3 million members of this Sub-Class by account number.  Declaration of Jay Playter ¶ 4 ("Playter Decl.") (Exh. C hereto); Declaration of Kenneth Jue ¶ 11 ("Jue Decl.") (Exh. D hereto).  For guidance and notice purposes, the Sub-Class members generally held one or more of the following Sprint accounts:

- Individual Liable Accounts that were opened on or after November 11, 2007, and on or before December 31, 2007;

- Individual Liable Accounts that were on suspension on November 11, 2007, but that were subsequently reinstated;

- Individual Liable Accounts that were opened on or after October 5, 2008, and on or before December 31, 2008;

- Individual Liable Accounts that were on suspension on October 5, 2008, but that were subsequently reinstated;

- Individual Liable Accounts that were opened as new accounts in Sprint retail stores in 2009;

- Individual Liable Accounts that were opened on or after November 8, 2009, and on or before December 31, 2009; or

- Individual Liable Accounts that were on suspension on November 8, 2009, but that were subsequently reinstated.

Agreement § I(P).

2.    <u>Prospective Relief for the Settlement Class</u>

In this case, Plaintiffs alleged that the disclosures and wireless services agreements that Sprint provided to its customers were inherently unclear as to (i) whether Sprint Surcharges could only be imposed to recoup Sprint's costs of complying with governmental programs, (ii) whether the nature and make-up of Sprint Surcharges were subject to change, and (iii) the type of notice Sprint had to provide before increasing the amounts of Sprint Surcharges. <u>E.g.</u>, Dkt. No. 41. These questions are answered in the important Prospective Relief that is being provided to all Class Members.   Agreement § II(A).   In collaboration with Class Counsel, Sprint has reviewed and revised its point of sale disclosures, invoice disclosures, wireless services agreement terms and conditions, website disclosures, and invoice notices to reflect the following:

- that Sprint Surcharges are not taxes or amounts Sprint is required to collect from its customers by law;

- that Sprint Surcharges are separated and clearly differentiated from Government Taxes and Fees that Sprint is required to collect from customers;

- that Sprint shall not refer to Sprint Surcharges set by Sprint as being taxes or amounts that Sprint is required by law to collect and remit to any government entity; and

- that when Sprint increases the amounts of Sprint Surcharges it will provide notice of any such change which will inform customers of the change, the effective date of the change, how to obtain additional information, and a reminder to consult their wireless services agreement.

<u>Id.</u>  The revised notices and disclosures are set forth in Exhibit H to the Agreement.  This relief ensures that in the future customers will be fully informed not only of the true nature and amount of Sprint Surcharges, but of any changes thereto, as well as what the customers' rights are in response to future changes.  Joint Decl. ¶¶ 40-41.

For example, if Sprint materially changes the nature of Sprint Surcharges, Class Members will now know to consult their contract to determine their rights in response.  <u>Id.</u> at ¶ 41.  The

Sprint contract allows the customer to terminate service without incurring an ETF (up to $350)

under the following circumstances:

> [i]f a change we make to the Agreement is material and has a material adverse effect on Services under your Term Commitment, you may terminate each line of Service materially adversely affected without incurring an Early Termination Fee only if: (a) call us within 30 days after the effective date of the change; (b) you specifically advise us that you wish to cancel Services because of a material change to the Agreement that we have made; and (c) we fail to negate the change after you notify us of your objection to it.

Sprint Contract Terms & Conditions, p. 6 (Exh. E hereto).   Because of the revisions to the

Prospective Relief, the Settlement Class Members are put in a position to take prompt action

(without penalty) if Sprint materially modifies its Surcharges.  Joint Decl. ¶ 42.

> 3.    Additional Settlement Benefits for the Fee Notice Sub-Class

In addition to the foregoing relief, the approximately 2.3 million members of the Fee

Notice Sub-Class may file a Claim with the Claims Administrator to receive either a Cash

Benefit or one of the Non-Cash Benefits.  Agreement §§ I(P), II(B); also Jue Decl. ¶ 11 (attesting

as to the amount of Sub-Class members); Joint Decl. ¶ 43.

The Cash Benefit is (1) a $1 account credit for a current customer or a former customer

with an unpaid account due Sprint, or (2) a $1 check, electronic transfer or e-account credit to a

former customer whose account is not past due.  Agreement § II(B)(2).

The Non-Cash Benefits are:  (1) a 30-minute long distance, domestic calling card; (2) a

30% discount on any accessory purchased at a Sprint-owned retail store, limited to one

accessory; or (3) a waiver of the $36 activation fee when activating a new line of service under

Sprint's then-existing Terms & Conditions of Services.  To be eligible for the waiver of the $36

activation fee, the Claimant must be eligible under Sprint's activation and credit policies.  Id. at ¶

II(B)(3).

Given that these customers were allegedly not given notice of minor Surcharge increases (i.e., $0.24/month), the available relief represents a substantial portion, if not all, of the damages the Sub-Class could have hoped to win at trial.  Joint Decl. ¶ 46.

4.      All Costs Associated with the Settlement

Sprint has agreed to pay any and all claims administration and notice costs, separate and apart from any monetary relief that is being paid to the Fee Notice Sub-Class.   Agreement § IV(A)-(D).  Such costs, to date, are approximately $583,000.  Playter Decl. ¶ 8.

5.      Release of Claims Against Sprint

In exchange for the benefits conferred by the Settlement, all Settlement Class Members who do not opt out will be deemed to have released Sprint from claims related to the subject matter of the Action.   The detailed release language can be found in Section VII of the Agreement.

6.      The Notice Program

The Notice Program – Section III of the Agreement – was designed to provide the best notice practicable and is tailored to take advantage of the information Sprint has available about the Settlement Class Members.   The Notice Program was reasonably calculated under the circumstances to apprise the Settlement Class of the pendency of the Action, the terms of the Settlement, Class Counsel's Fees and Cost Application and request for Incentive Awards for Plaintiffs, and their rights to opt-out of the Settlement Class or object to the Settlement.  Joint Decl. ¶ 50.  The Notices and Notice program constitute sufficient notice to all persons entitled to notice and satisfy all applicable requirements of law, including, but not limited to, Federal Rule of Civil Procedure 23 and the constitutional requirement of due process.  Joint Decl. ¶ 50; also Playter Decl. ¶¶ 3-7; Jue Decl. ¶¶ 5-16.

7.     The Claims Process

Gilardi & Co. has served as the Claims Administrator.  Agreement § I(J); Preliminary

Approval Order, ¶ 8.  Fee Notice Sub-Class Members were given the option of completing the

Claim Form online at the Settlement Website or submitting the Claim Form by mail.  Claimants

have until the Claims  Deadline  to file  a Claim  Form  and  to show sufficient proof that they

are eligible under the Settlement Benefit Rules.  Agreement § I(H).

If a Claim for Cash Benefits is accepted, there shall be no notice of acceptance required

to be sent to the Claimant.  Tender of the settlement benefit shall suffice for notice.  On the other

hand, if a Claim for Non-Cash Benefits is accepted, the Claims Administrator shall provide the

Claimant with a letter or email containing a unique code and/or instructions that will enable the

Claimant  to  obtain  his  or  her  Non-Cash  Benefit  if  and  when  such  settlement  benefits  are

tendered, along with instructions for how and when to obtain the Settlement Benefit.  Agreement

§ II(C)(9)-(11); Joint Decl. ¶¶ 52-53.

8.     Settlement Termination

Either  Party  may  terminate  the  Settlement  if  the  Settlement  is  rejected  or  materially

modified by the Court or an appellate court.  Agreement § V(D).  Sprint also has the right to

terminate the Settlement if the number of Settlement Class Members who timely opt out of the

Settlement Class constitutes a significant percentage of the Settlement Class as agreed on by the

parties in writing.  Id. at § V(D)(b).

9.     Incentive Awards to Class Representatives

Pursuant to the Agreement, Class Counsel will seek and Sprint will not oppose Incentive

Awards of $5,000 per named Plaintiff.  Agreement § VI(D).  If the Court approves them, the

Incentive Awards will be paid by Sprint separately from the benefits being afforded to the Class

and Sub-Class.  Id.; Joint Decl. ¶ 55.  These awards will compensate Mr. Barkwell and Mr. Massey for their time and effort in the Action, and for the risk they undertook in prosecuting the Action against Sprint.  Joint Decl. ¶ 55.  The parties negotiated and reached agreement regarding the Incentive Awards only after reaching agreement on all other material terms of the Settlement. Joint Decl. ¶ 57.

   10. Attorneys' Fees and Costs

  Sprint will not oppose Class Counsel's request for attorneys' fees and expenses of up to $500,000.  Agreement § VI(C).  The parties negotiated and reached agreement regarding attorneys' fees and costs only after reaching agreement on all other material terms of this Settlement.  Id.; Joint Decl. ¶ 57.  Such fees and expenses will not be deducted from the Settlement Benefits available to the Sub-Class.  Joint Decl. ¶ 56.

**C.** **Argument and Citation of Authority**

  Court approval is required for settlement of a class action.  Fed. R. Civ. P. 23(e).  The federal courts have long recognized a strong policy and presumption in favor of class settlements.  The Rule 23(e) analysis should be "informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement."  In re Chicken Antitrust Litig. Am. Poultry, 669 F.2d 228, 238 (5th Cir. Unit B 1982).  In evaluating a proposed class settlement, courts "will not substitute its business judgment for that of the parties; 'the only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.'"  Rankin v. Rots, 2006 WL 1876538, *3 (E.D. Mich. June 28, 2006) (quoting Zerkle v. Cleveland-Cliffs Iron Co., 52 F.R.D. 151, 159 (S.D.N.Y. 1971)).  Indeed, "[s]ettlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing

lawsuits." In re Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1105 (5th Cir. 1977).  Class settlements minimize the litigation expenses of the parties and reduce the strain that litigation imposes upon already scarce judicial resources.  Therefore, "federal courts naturally favor the settlement of class action litigation." Isby v. Bayh, 75 F.3d 1191, 1196 (7th Cir. 1996).

The Settlement here is more than sufficient under Rule 23(e) and Final Approval is clearly warranted.

1.    The Court Has Personal Jurisdiction Over Settlement Class Members Who Receive Adequate Notice and an Opportunity to Be Heard

In addition to having personal jurisdiction over the Plaintiffs, who are parties to this Action, the Court also has personal jurisdiction over all members of the Settlement Class that receive the requisite notice and due process.  See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811-12 (1985) (citing Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314-15 (1950)); see also In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 306 (3d Cir. 1998), cert. denied, 525 U.S. 1114 (1999).

a.    The Best Notice Practicable Was Ordered

The Notice program was comprised of five parts: (1) Invoice Notice to be sent to all identifiable Settlement Class Members who are current customers; (2) Direct Mail Notice to be sent to all identifiable Settlement Class Members who are former customers; (3) a Summary Notice to be posted on www.sprint.com; (4) a Publication Notice which was designed to reach those Settlement Class Members for whom Invoice Notice and Direct Mail Notice was not possible; and (5) a Long Form Notice with more detail than the other notices to be available on the Settlement Website (www.sprintsurchargesettlement.com) and via mail upon request. Agreement § III(A)-(E); Exhs. C through F to Agreement; Jue Decl. ¶¶ 4-16; Playter Decl. ¶¶ 3-7.

*Most* facets of the approved Notice Program have been properly accomplished.  Jue Decl. ¶ 4-16; Playter Decl. ¶¶ 3-7.  First, in December 2013 Sprint successfully sent Invoice Notice to the approximately 11.64 million Settlement Class Members who are comprised of current, active customers.  Id. at ¶ 5.  This includes all members of the Fee Notice Sub-Class who are current, active customers.  Jue Decl. ¶ 11.

Second, Direct Mail Notice was provided to the 1.79 million members of the Fee Notice Sub-Class who are not current, active customers.[3]  Playter Decl. ¶ 4; Jue Decl. ¶¶ 5-11.  On February 4, 2014, however, Class Counsel were first notified by Sprint that former and/or current, non-active customers who are *not* members of the Fee Notice Sub-Class were *not* provided with Direct Mail Notice of the Settlement in accordance with the Preliminary Approval Order.  Joint Decl. ¶ 51.  Sprint contends Direct Mail Notice to this particular group of Settlement Class Members was not intentionally contemplated by the parties, was inadvertently put in the final draft of the Settlement Agreement, and is not necessary in this particular case.  Class Counsel understands that Sprint plans to move the Court to amend the Direct Mail Notice requirement with respect to these class members.  Class Counsel will comment on such motion soon after it is filed.[4]  Id.

Third, on November 8, 2013, Sprint posted the Summary Notice on its website.  Playter Decl. ¶ 6.

Fourth, the Publication Notice was completed through an advertisement in *USA Today* on November 7, 2013.  Jue Decl. ¶ 12.

---

[3] 97% of Fee Notice Sub-Class members received either Invoice Notice or Direct Mail Notice of the settlement.  Jue Decl. ¶ 11.

[4] The Final Approval Hearing may ultimately need to be continued, and supplemental briefing submitted, depending on the relief requested by Sprint and the Court's ruling thereon.

Fifth, the interactive Settlement Website was established and has been continually operational since November 7, 2013, to enable Settlement Class Members to obtain detailed information about the Action and the Settlement, including the Long Form Notice.  Id. at ¶¶ 15-16.  As of February 4, 2014, the Settlement Website had 97,200 unique visitors.  Id.

Additionally, a toll-free phone number to assist Settlement Class Members through a pre-recorded Interactive Voice Response ("IVR"), as well as trained call center representatives to assist potential class members with questions, requests or assistance, including Spanish-speaking representatives, was established and has operated continuously since November 7, 2013.  Jue Decl. ¶ 13.  As of February 4, 2014, the toll-free number has received 25,522 calls.  Id.

        b.    The Notice Was Reasonably Calculated to Inform Settlement Class Members of Their Rights

The Court-approved Notice satisfies due process requirements because it described "the substantive claims . . . [and] contain[ed] information reasonably necessary to make a decision to remain a class member and be bound by the final judgment."  In re Nissan Motor Corp. Antitrust Litig., 552 F.2d at 1104-05.  The Notice, among other things, defined the Settlement Class, described the release provided to Sprint under the Settlement as well as the nature and amount of the benefits provided by the Settlement, and informed Settlement Class Members of their right to opt-out and object, the procedures for doing so, and the time and place of the Final Approval Hearing.  It also notified Settlement Class Members that a class judgment would bind them unless they opted out, and told them where they could get more information – for example, at the website that posts a copy of the Agreement, as well as other important court documents.  Further, the Notice described Class Counsel's intention to seek attorneys' fees and costs of up to $500,000 and Incentive Awards of $5,000 for each of the two named Plaintiffs.  Hence, the Settlement Class Members were provided with the best practicable notice, which was

"reasonably calculated, under [the] circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  Shutts, 472 U.S. at 812 (quoting Mullane, 339 U.S. at 314-15); also Joint Decl. ¶ 51.

As of February 4, 2014, the Settlement Administrator had received 338 requests for exclusion (opt-outs).  Jue Decl. ¶ 17.  As of that date, only three objections to the Settlement had been received.  Joint Decl. ¶ 72; also Dkt. Nos. 80, 82-83.

2.     The Settlement Should Be Approved as Fair, Adequate, and Reasonable

In deciding whether to approve the Settlement, the Court will analyze whether it is "fair, adequate, reasonable, and not the product of collusion."  Leverso v. Southtrust Bank, 18 F.3d 1527, 1530 (11th Cir. 1994); see also Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984).  A settlement is fair, reasonable, and adequate when "the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued."  In re Lorazepam & Clorazepate Antitrust Litig., 2003 WL 22037741, *2 (D.D.C. June 16, 2003) (quoting Manual for Complex Litigation (Third) § 30.42 (1995)).  Importantly, the Court is "not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial."  In re Mexico Money Transfer Litig., 164 F. Supp. 2d 1002, 1014 (N.D. Ill. 2000) (citations omitted).

The Eleventh Circuit has identified six factors to be considered in analyzing the fairness, reasonableness and adequacy of a class settlement under Rule 23(e):

(1)     the existence of fraud or collusion behind the settlement;

(2)     the complexity, expense, and likely duration of the litigation;

(3)     the stage of the proceedings and the amount of discovery completed;

(4)     the probability of the plaintiffs' success on the merits;

20

(5)     the range of possible recovery; and

(6)     the opinions of the class counsel, class representatives, and the substance
        and amount of opposition to the settlement.

Leverso, 18 F.3d at 1530 n.6; see also Bennett, 737 F.2d at 986.  The analysis of these factors set

forth below shows this Settlement to be eminently fair, adequate, and reasonable.

           a.     There Was No Fraud or Collusion

This Court well knows the vigor with which the parties litigated until they reached the

Settlement.  The sharply contested nature of the proceedings in this Action demonstrates the

absence of fraud or collusion behind the Settlement.  See, e.g., Ingram v. Coca-Cola Co., 200

F.R.D. 685, 693 (N.D. Ga. 2001) (court had "no doubt that this case has been adversarial,

featuring a high level of contention between the parties"); In re Motorsports Merchandise

Antitrust Litig., 112 F. Supp. 2d 1329, 1338 (N.D. Ga. 2000) ("This was not a quick settlement,

and there is no suggestion of collusion"); In re Sunbeam Sec. Litig., 176 F. Supp. 2d 1323, 1329

n.3 (S.D. Fla. 2001); Warren v. City of Tampa, 693 F. Supp. 1051, 1055 (M.D. Fla. 1988)

(record disclosed no evidence of collusion, but to the contrary showed "that the parties

conducted discovery and negotiated the terms of settlement for an extended period of time"),

aff'd, 893 F.2d 347 (11th Cir. 1989).

Class Counsel negotiated the Settlement with similar vigor.  Plaintiffs and the Settlement

Class were represented by experienced counsel throughout the negotiations.  The parties engaged

in extensive mediation before two experienced and respected mediators.  These negotiations

were arm's-length and extensive.  Joint Decl. ¶¶ 58-61.

b.    The Settlement Will Avert Years of Highly Complex and Expensive Litigation

This Action involves many millions of Settlement Class Members.  Playter Decl. ¶ 5; Joint Decl. ¶ 62.  Moreover, the claims and defenses are complex; litigating them is both difficult and time-consuming.  Id.  Although this Action was actively litigated for approximately three and a half years before the parties reached an agreement to resolve it, recovery by any means other than settlement would require additional years of litigation.  See United States v. Glens Falls Newspapers, Inc., 160 F. 3d 853, 856 (2d Cir. 1998) (noting that "a principal function of a trial judge is to foster an atmosphere of open discussion among the parties' attorneys and representatives so that litigation may be settled promptly and fairly so as to avoid the uncertainty, expense and delay inherent in a trial."); In re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297, 317, 325-26 & n.32 (N.D. Ga. 1993) ("[A]djudication of the claims of two million claimants could last half a millennium").

In contrast, the Settlement provides immediate, meaningful benefits to millions of Settlement Class Members, all of whom are current or former Sprint customers.  Joint Decl. ¶ 62.  As stated in In re Shell Oil Refinery, 155 F.R.D. 552 (E.D. La. 1993):

> The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation.  In this respect, "[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush."

Id. at 560 (alterations in original) (quoting Oppenlander v. Standard Oil Co., 64 F.R.D. 597, 624 (D. Colo. 1974)); see also In re U.S. Oil & Gas Litig., 967 F.2d 489, 493 (11th Cir. 1992) (noting that complex litigation "can occupy a court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive").  Particularly because the "demand for time on the existing judicial system must be evaluated in determining

the reasonableness of the settlement," Ressler v. Jacobson, 822 F. Supp. 1551, 1554 (M.D. Fla. 1992) (citation omitted), there can be no doubt about the adequacy of the present Settlement, which provides generous benefits to the Class.

> c.   The Factual Record Is Sufficiently Developed to Enable Class Counsel to Make a Reasoned Judgment

Courts also consider "the degree of case development that class counsel have accomplished prior to settlement" to ensure that "counsel had an adequate appreciation of the merits of the case before negotiating." In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 813 (3d Cir. 1995). At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." Ressler, 822 F. Supp. at 1555.

Extensive written discovery occurred in the Action. Joint Decl. ¶ 64. This discovery afforded Class Counsel insight into the strengths and weaknesses of the contract and non-contract-based claims against Sprint. Id. Class Counsel initially used this information to refine and narrow the scope of Plaintiffs' claims. Id. Counsel also developed ample information and performed analyses from which "to determine the probability of . . . success on the merits, the possible range of recovery, and the likely expense and duration of the litigation." Mashburn v. Nat'l Healthcare, Inc., 684 F. Supp. 660, 669 (M.D. Ala. 1988); see Joint Decl. ¶¶ 64-65. Class Counsel also demanded and conducted detailed confirmatory discovery into Sprint's claim that the costs it expended on government associated programs actually exceeded the Surcharges it collected from customers during the relevant time frame. Joint Decl. ¶ 64. Such confirmatory discovery involved a study and analysis of Sprint's records and balance sheets by a reputable third party accounting firm. Id. This information further allowed Plaintiffs to evaluate the possible range of recovery at trial. Id.

23

d.      Plaintiffs Would Have Faced Significant Obstacles to Prevailing

The "likelihood and extent of any recovery from the defendants absent . . . settlement" is another important factor in assessing the reasonableness of a settlement.  Domestic Air, 148 F.R.D. at 314; see also Ressler, 822 F. Supp. at 1555 ("A Court is to consider the likelihood of the plaintiff's success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise.").  This case presented significant risks both at the outset and throughout the litigation.  Joint Decl. ¶ 66.

Sprint advanced significant defenses that Plaintiffs and Class Counsel would have been required to overcome in the absence of the Settlement.  Id.  First and foremost was Sprint's argument that Plaintiffs' claims must be arbitrated on a non-class basis.  Id. at ¶¶ 66, 93. Although Plaintiffs prevailed on this issue in this Court, Sprint's appeal was still pending at the time of settlement.  Id.  Had this Court's waiver finding been reversed by the Eleventh Circuit, the litigation would, practically speaking, have come to a screeching halt.

Also of significant danger to Plaintiffs' claims was Sprint's assertion of the voluntary payment doctrine.  Id. at ¶¶ 66, 95.  If Sprint was ultimately successful in proving this defense, most of the Class would have been left with no ability to pursue damages.  Id.

Moreover, there was also no guarantee Plaintiffs would have been able to represent a nationwide class in this case given that Sprint's uniform customer agreement is governed by the law of the particular state where the contract is entered.  Id. at ¶¶ 66, 94.  At some point, the Court would have needed to consider whether differences in each state's common law would predominate over the common legal and factual issues.  Id.  While Plaintiffs maintain they would have prevailed on this issue, some courts have disagreed.  Id.  If Plaintiffs' attempt to certify a

nationwide class was denied by this Court (or by the Eleventh Circuit on a Rule 23(f) petition) most of the Settlement Class would have been left with no relief. Id. at ¶ 71.

In short, this Action involved several major litigation risks. E.g., In re Checking Account Overdraft Litig., 830 F. Supp. 2d 1330, 1347-48 (S.D. Fla. 2011) ("The combined risks here were real and potentially catastrophic . . . . [B]ut for the Settlement, Plaintiffs and the class faced a multitude of potentially serious, substantive defenses, any one of which could have precluded or drastically reduced the prospects of recovery"). Apart from the risks, continued litigation would have involved substantial delay and expense, which further counsels in favor of Final Approval here. Plaintiffs would still have faced class certification, another summary judgment motion, a trial on the merits, and a post-judgment appeal. Joint Decl. ¶ 66. The uncertainties and delays from this process would have been significant. Id.

Given the myriad risks attending these claims, as well as the certainty of substantial delay and expense from ongoing litigation, the Settlement cannot be seen as anything except a fair compromise. See, e.g., Bennett v. Behring Corp., 96 F.R.D. 343, 349-50 (S.D. Fla. 1982), aff'd, 737 F.2d 982 (11th Cir. 1984) (plaintiffs faced a "myriad of factual and legal problems" creating "great uncertainty as to the fact and amount of damage," making it "unwise [for plaintiffs] to risk the substantial benefits which the settlement confers . . . to the vagaries of a trial").

   e. The Benefits Provided by the Settlement Are Fair, Adequate, and Reasonable Compared to the Range of Possible Recovery

In determining whether a settlement is fair given the potential range of recovery, the Court should be guided by "the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 542 (S.D. Fla. 1988), aff'd, 899 F.2d 21 (11th Cir. 1990). Indeed, "[a] settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a

single percent of the potential recovery." Id.  This is because a settlement must be evaluated "in light of the attendant risks with litigation." Thompson v. Metropolitan Life Ins. Co., 216 F.R.D. 55, 64 (S.D.N.Y. 2003); see also Bennett, 737 F.2d at 986 ("[C]ompromise is the essence of settlement.").  Thus, courts regularly find settlements to be fair where "[p]laintiffs have not received the optimal relief." Warren, 693 F. Supp. at 1059; see, e.g., Great Neck Capital Appreciation Inv. P'ship, L.P. v. PriceWaterHouseCoopers, LLP, 212 F.R.D. 400, 409-10 (E.D. Wis. 2002) ("The mere possibility that the class might receive more if the case were fully litigated is not a good reason for disapproving the settlement.").

Having litigated many other nationwide class actions, Class Counsel have a thorough understanding of the practical and legal issues they would continue to face litigating these claims against Sprint.  Joint Decl. ¶ 71; also Exhibit 1 to Joint Decl. (Firm Resume).  Plaintiffs faced challenges presented by a large, multistate class certification proceeding.  Even if Plaintiffs succeeding in obtaining certification, defeating an inevitable Rule 23(f) petition, and surviving a second motion for summary judgment, they still would have been needed to prevail both at trial and on appeal. Id.

Discovery revealed that the potential damages available at trial may have been limited. Id. at ¶¶ 67-68.  Confirmatory discovery produced by Sprint suggested that Plaintiffs faced an uphill battle proving that the amount of the Surcharges imposed by Sprint exceeded Sprint's costs of complying with governmental programs. Id. at ¶ 67.  Thus, there was the possibility Plaintiffs could prevail at trial on this claim and have limited to no damages. Id.

Moreover, the damages of the 2.3 million members of the Fee Notice Sub-Class (i.e., those who did not receive notice of $0.24/monthly increases to Sprint Surcharges) may have also been limited. Id. at ¶ 68.  The Settlement Benefits which provide the Sub-Class Members with

the right to obtain a minimum of $1.00 in Cash Benefits (i.e., the equivalent of four months worth of increases) and a maximum of $36.00 in Non-Cash Benefits are thus an extremely fair and reasonable recovery.  Id. at ¶ 68.  This is especially true in light of Sprint's defenses and the challenging, unpredictable path of litigation Plaintiffs would otherwise have continued to face in the trial and appellate courts.  Id. at ¶¶ 66, 70.

Moreover, Sprint's agreement to pay separately from any relief provided to the Class (i) Class Counsel's requested attorneys' fees, (ii) the requested Incentive Awards to the named Plaintiffs, and (iii) all expenses of the Notice Administrator and Settlement Administrator (to date, $583,000) further enhance the Settlement.  Joint Decl. ¶ 69; Playter Decl. ¶ 8.  Given the extraordinary obstacles that Plaintiffs faced in the litigation, this recovery is a significant achievement by any objective measure.

> f.    The Opinions of Class Counsel, the Class Representatives, and Absent Class Members Favor Approval of the Settlement

Class Counsel wholeheartedly endorse the Settlement with Sprint.  Joint Decl. ¶¶ 70, 73. The Court should give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation."  Warren, 693 F. Supp. at 1060; see also Domestic Air, 148 F.R.D. at 312-13 ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel.  '[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.'") (citations omitted).

To date, opposition to the Settlement has been *de minimis*.  As of February 4, 2014, only 338 of the millions of Settlement Class Members had requested to be excluded from the Settlement Class.  Jue Decl. ¶ 17.  As of February 4, 2014, only three Settlement Class Members had objected to the Settlement.   Joint Decl. ¶ 72.  This is yet another indication that the

Settlement Class is satisfied with the Settlement.  It is settled that "[a] small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness."  <u>Assn. for Disabled Americans. v. Amoco Oil Co.</u>, 211 F.R.D. 457, 467 (S.D. Fla. 2002); <u>also</u> <u>Mangone v. First USA Bank</u>, 206 F.R.D. 222, 227 (S.D. Ill. 2001) ("In evaluating the fairness of a class action settlement, such overwhelming support by class members is strong circumstantial evidence supporting the fairness of the Settlement"); <u>Austin v. Penn. Dept. of Corrections</u>, 876 F. Supp. 1437, 1458 (E.D. Pa. 1995) ("Because class members are presumed to know what is in their best interest, the reaction of the class to the Settlement Agreement is an important factor for the court to consider").

   3. <u>The Court Should Certify the Settlement Class</u>

  Based on the foregoing, the Settlement is fair, adequate, and reasonable, and merits Final Approval.

### III. APPLICATION FOR INCENTIVE AWARDS

  Pursuant to the Settlement, Class Counsel request, and Sprint does not oppose, Incentive Awards of $5,000 per named Plaintiff.  Agreement § V(D).  Incentive awards "compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."  <u>Allapattah Servs., Inc. v. Exxon Corp.</u>, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006).  "[T]here is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action."  <u>David v. Am. Suzuki Motor Corp.</u>, 2010 WL 1628362, *6 (S.D. Fla. Apr. 15, 2010).  Courts have consistently found incentive awards to be an efficient and productive way to encourage members of a class to become class representatives.  <u>E.g.</u>, <u>Ingram v. The Coca-Cola Co.</u>, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (awarding class representatives $300,000 each, explaining that "the magnitude of the

relief the Class Representatives obtained on behalf of the class warrants a substantial incentive award."); Spicer v. Chicago Bd. Options Exchange, Inc., 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993) (collecting cases approving service awards ranging from $5,000 to $100,000, and awarding $10,000 to each named plaintiff).

The relevant factors include: (1) the actions the class representatives took to protect the interests of the class; (2) the degree to which the class benefited from those actions; and (3) the amount of time and effort the class representatives expended in pursuing the litigation. E.g., Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998).

The above factors, as applied to this Action, demonstrate the reasonableness of Incentive Awards to both named Plaintiffs. Joint Decl. ¶ 77; e.g., Checking Account Overdraft, 830 F. Supp. 2d at 1357-58 ("The Court notes that the class representatives expended time and effort in meeting their fiduciary obligations to the Class, and deserve to be compensated for it."). The Incentive Awards will be paid by Sprint on top of the other relief being paid to the Class. Joint. Decl. ¶ 55.

Mr. Barkwell and Mr. Massey provided assistance that enabled Class Counsel to successfully prosecute the Action and reach the Settlement, including (1) submitting to interviews with Class Counsel, (2) locating and forwarding responsive documents and information (i.e., advertisements, monthly account statements, and account agreements), and (3) participating in conferences with Class Counsel. In so doing, the Plaintiffs were integral to forming the theory of the case. Joint Decl. ¶ 77.

The named Plaintiffs not only devoted time and effort to the litigation, but the end result of their efforts, and those of Class Counsel, was a substantial benefit to the Settlement Class. Id. If the Court approves them, the Incentive Awards of $5,000 per named Plaintiff will be well

below the range of what has been deemed to be reasonable service awards.  E.g., Enter. Energy Corp. v. Columbia Gas Transmission, 137 F.R.D. 240, 251 (S.D. Ohio 1991) (approving service awards totaling $300,000).  The Incentive Awards requested here are reasonable and should be approved.

## IV.    APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

As indicated in the Agreement and the Notice, and consistent with standard class action practice and procedure, Class Counsel respectfully request this Court award them attorneys' fees and the reimbursement of their out-of-pocket expenses in the total amount of $500,000. Agreement § V(C); Joint Decl. ¶ 78.  The parties negotiated and reached agreement regarding attorneys' fees and expenses only after reaching agreement on all other material terms of this Settlement.  Agreement § V(C); Joint Decl. ¶¶ 57, 78.  The fee request is within the guidelines set forth by the Eleventh Circuit in Camden I Condominium Association. v. Dunkle, 946 F.2d 768 (11th Cir. 1991).

In this case, Class Counsel has obtained two primary benefits for the Class.  The first is the Prospective Relief that is being provided to all Class Members.  Agreement § II(A).  The revisions to Sprint's disclosures, contract terms and conditions, and notices ensure that in the future, customers will be fully informed not only of the true nature and amount of Sprint Surcharges, but in advance of any changes thereto, as well as a reminder to consult the parties' contract, which explains what the customers' rights are in response to such changes.  Revised Notices & Disclosures; Joint Decl. ¶¶ 40-42.  This Prospective Relief will keep Class Members fully informed and has the potential to save them millions of dollars in saved ETF's.  See Sprint Contract Terms & Conditions, p. 5 (explaining when and how customers can cancel their service without incurring an ETF).

Although this Prospective Relief is obviously meaningful and important, it is difficult to quantify; therefore, Class Counsel do not claim that any part of such relief establishes a common fund upon which to base a request for attorneys' fees.  Rather, Class Counsel's fee request is based on the Settlement Benefits that are available to the Fee Notice Sub-Class.  *At a minimum*, the Settlement Benefits provide a $2.3 million common fund to the Sub-Class.[5]  Agreement §§ I(P), II(B); <u>also</u> Jue Decl. ¶ 11; Joint Decl. ¶¶ 43-46.  Class Counsel's $500,000 fee request approximates 21.74% of this common fund.  Moreover, if the attorneys' fees themselves are added to this fund (i.e., $2.3 million + $500,000), the fees would only equal 17.86% of the common fund.[6]  For the reasons detailed herein, Class Counsel submit that the requested fee is appropriate, fair, and reasonable, and should be approved.

A.    <u>The Law Awards Class Counsel Fees From the Common Fund Created Through Their Efforts</u>

It is well established that when a representative party has conferred a substantial benefit upon a class, counsel is entitled to attorneys' fees based upon the benefit obtained.  <u>Camden I</u>, 946 F.2d at 771; <u>Boeing Co. v. Van Gemert</u>, 444 U.S. 472, 478 (1980).  The common benefit doctrine is an exception to the general rule that each party must bear its own litigation costs.  The doctrine serves the "twin goals of removing a potential financial obstacle to a plaintiff's pursuit

---

[5] If one considers that Sub-Class Members have the option of receiving a non-expiring $36 voucher for a free line of service, in lieu of $1, the common fund is actually much greater that $2.3 million.  Agreement, § I(P), II(B).  For example, if the value of the common fund were based on the $36 line of service voucher, it would amount to $82.8 million.

[6] Courts often include attorneys' fees that a Defendant agrees to pay separately from the common fund as part of the common fund when awarding fees under the percentage of fund method.  <u>E.g.</u>, <u>Johnston v. Comerica Mortg. Corp.</u>, 83 F.3d 241, 246 (8th Cir.1996); <u>Lonardo v. Traveler's Indem. Co.</u>, 706 F. Supp. 2d 766, 803 (N.D. Oh. 2010) ("the attorneys' fee award is a negotiated aspect of the Settlement Agreement that provides a benefit to the Settlement Class.  Consequently, for purposes of calculating the percentage of the fee, the attorneys' fee award [] is part of the Total Class Benefit"); <u>also</u> Smith Decl. ¶ 7 (stating that this is "generally accepted practice").

of a claim on behalf of a class and of equitably distributing the fees and costs of successful litigation among all who gained from the named plaintiff's efforts."  In re Gould Sec. Litig., 727 F. Supp. 1201, 1202 (N.D. Ill. 1989) (citation omitted).  The common benefit doctrine stems from the premise that those who receive the benefit of a lawsuit without contributing to its costs are "unjustly enriched" at the expense of the successful litigant.  Van Gemert, 444 U.S. at 478.  As a result, the Supreme Court and the Eleventh Circuit have recognized that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as whole.  Id.; see also Camden I, 946 F.2d at 771 ("Attorneys in a class action in which a common fund is created are entitled to compensation for their services from the common fund, but the amount is subject to court approval.").  Courts have also recognized that appropriate fee awards in cases such as this encourage redress for wrongs caused to entire classes of persons, and deter future misconduct of a similar nature.  See, e.g., Mashburn, 684 F. Supp. at 687; see also Deposit Guar. Nat'l Bank v. Rope, 445 U.S. 326, 338-39 (1980).  Adequate compensation promotes the availability of counsel for aggrieved persons:

> If the plaintiffs' bar is not adequately compensated for its risk, responsibility, and effort when it is successful, then effective representation for plaintiffs in these cases will disappear . . . .  We as members of the judiciary must be ever watchful to avoid being isolated from the experience of those who are actively engaged in the practice of law.  It is difficult to evaluate the effort it takes to successfully and ethically prosecute a large plaintiffs' class action suit.  It is an experience in which few of us have participated.  The dimensions of the undertaking are awesome.

Muehler v. Land O'Lakes, Inc., 617 F. Supp. 1370, 1375-76 (D. Minn. 1985).

In the Eleventh Circuit, class counsel receives a percentage of the funds obtained through a settlement.  In Camden I – the controlling authority regarding attorneys' fees in common-fund class actions – the Eleventh Circuit held that "the percentage of the fund approach [as opposed to

the lodestar approach] is the better reasoned in a common fund case.  Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class."  Camden I, 946 F.2d at 774; also Checking Account Overdraft Litig., 830 F. Supp. 2d at 1362 ("the Eleventh Circuit made clear in Camden I that percentage of the fund is the exclusive method for awarding fees in common fund class actions").

The Court has substantial discretion in determining the appropriate fee percentage. "There is no hard and fast rule mandating a certain percentage of a common fund which may be awarded as a fee because the amount of any fee must be determined upon the facts of each case." Sunbeam, 176 F. Supp. 2d at 1333 (quoting Camden I, 946 F.2d at 774).  Nonetheless, "[t]he majority of common fund fee awards fall between 20 percent to 30 percent of the fund" – though "an upper limit of 50 percent of the fund may be stated as a general rule."  Id. (quoting Camden I, 946 F.2d at 774-75); see also Waters v. Int'l Precious Metals Corp., 190 F.3d 1291 (11th Cir. 1999), cert. denied, 530 U.S. 1289 (2000) (approving fee award where the district court determined that the benchmark should be 30 percent and then adjusted the fee award higher in view of the circumstances of the case).

**B.     Application of the *Camden I* Factors Supports the Requested Fee**

The Eleventh Circuit has provided a set of factors the Court should use to determine a reasonable percentage to award class action counsel:

(1)     the time and labor required;

(2)     the novelty and difficulty of the relevant questions;

(3)     the skill required to properly carry out the legal services;

(4)     the preclusion of other employment by the attorney as a result of his acceptance of the case;

(5)    the customary fee;

(6)    whether the fee is fixed or contingent;

(7)    time limitations imposed by the clients or the circumstances;

(8)    the results obtained, including the amount recovered for the clients;

(9)    the experience, reputation, and ability of the attorneys;

(10)   the "undesirability" of the case;

(11)   the nature and the length of the professional relationship with the clients; and

(12)   fee awards in similar cases.

Camden I, 946 F.2d at 772 n.3 (citing factors originally set forth in Johnson v. Ga. Hwy. Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974)).

These twelve factors are guidelines and are not exclusive.  "Other pertinent factors are the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel, any non-monetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting a class action."  Sunbeam, 176 F. Supp. 2d at 1333 (quoting Camden I, 946 F.2d at 775).  In addition, the Eleventh Circuit has "encouraged the lower courts to consider additional factors unique to the particular case."  Camden I, 946 F.2d at 775.  As applied here, the Camden I factors demonstrate that the Court should approve the requested fee.  Smith Decl. ¶¶ 9-23.

1.    The Claims Against Sprint Required Substantial Time and Labor

Prosecuting and settling these claims demanded considerable time and labor, making this fee request reasonable.  Class Counsel spent a substantial amount of time investigating the claims of several potential plaintiffs against Sprint.  Joint Decl. ¶ 80.  Class Counsel interviewed

34

numerous Sprint customers and potential plaintiffs to gather information about Sprint's disclosure and imposition of Sprint Surcharges, both at the time the lawsuit was filed and in the past. Id. This information was critical to Class Counsel's ability to understand the nature of Sprint's Surcharge practices, the language and impact of the contracts at issue, and potential remedies. Id. Class Counsel also expended significant resources researching and developing the legal claims at issue. Joint Decl. ¶ 81.

Soon after the case was filed, Class Counsel served written discovery requests on Sprint seeking relevant and probative documents and information. Joint Decl. ¶ 82. The process of developing, refining, and finalizing the multiple sets of written discovery requests at issue – with an eye toward class certification, summary judgment, and trial – required considerable effort on the part of Class Counsel. Id. Sprint asserted objections to discovery requests as to many categories of relevant documents. Joint Decl. ¶ 83. The parties exchanged correspondence regarding discovery-related issues and held conferences to resolve the discovery issues between them. Id. Class Counsel did not hesitate to diligently seek Court relief once it was apparent the parties could not informally resolve their differences. E.g., Dkt. Nos. 15, 27, 33, 38.

Sprint ultimately produced a substantial number of internal Sprint documents in discovery. Joint Decl. ¶ 84. Class Counsel reviewed these documents in a timely fashion and relied upon them both in seeking an amendment to the complaint and gauging Plaintiffs' chances of prevailing. Id.

Class Counsel also devoted substantial resources to fending off the many motions filed by Sprint. Id. at ¶ 85. Indeed, Sprint filed and vigorously pursued *four* separate potentially dispositive motions before Plaintiffs even had a realistic opportunity to move for class

certification.  Dkt. Nos. 7, 11, 44, 63.  Class Counsel timely and successfully fended off these efforts.  Joint Decl. ¶ 85.

Settlement negotiations consumed additional time and resources.  Preliminary settlement discussions began in early 2011 and the first mediation session was held in February 2011 with mediator Art Glaser.  Joint Decl. ¶ 24.  The mediation required substantial preparation and follow-up work.  Id. at ¶ 86.  Discussions broke off when the Supreme Court's Concepcion decision was issued but reconvened in the Eleventh Circuit while Sprint's arbitration appeal was pending.  On April 17, 2012, the parties participated in a second mediation session, this time with Eleventh Circuit mediator Bill Roland.  Joint Decl. ¶ 29.  Although the parties grew close to an agreement, additional negotiations were necessary.  Id.  On October 2, 2012, a second mediation with Mr. Roland was held and eventually a deal was struck and the MOU was signed. Joint Decl. ¶ 31.   Several months of detailed discussions followed concerning the specific terms of the Settlement.  Id. at ¶¶ 30-36.  Once all discussions, drafting, and confirmatory discovery was completed, the Agreement was executed in October 2013.  Id.

All told, Class Counsel's coordinated work paid great dividends for the Settlement Class. Each of the above-described efforts was essential to achieving the Settlement before the Court. Joint Decl. ¶ 87.  The time and resources Class Counsel devoted to prosecuting and settling this Action readily justify the fee that is requested.  Smith Decl. ¶ 10 ("[i]t is obvious and beyond legitimate dispute that Class Counsel devoted substantial time and effort in this case").

2.    The Issues Involved Were Novel and Difficult, and Required the Skill of Highly Talented Attorneys

In any given case, the skill of legal counsel should be commensurate with the novelty and complexity of the issues, as well as the skill of the opposing counsel.  Litigation of this Action required counsel highly trained in class action law and procedure as well as the specialized issues

presented here.  Class Counsel possess these attributes, and their participation added immense value to the representation of this large Settlement Class.  Joint Decl. ¶ 88; Smith Decl. ¶ 12. The record demonstrates that the Action involved a broad range of complex and novel challenges, which Class Counsel met at every juncture.  Joint Decl. ¶ 89; Smith Decl. ¶ 11.

In evaluating the quality of representation by Class Counsel, the Court should also consider the quality of opposing counsel.  See Camden I, 946 F.2d at 772 n.3; Ressler, 149 F.R.D. at 654.  Throughout the litigation, Sprint was represented by extremely capable counsel at McGuire Woods, LLP.  They too have much class action experience and were worthy, highly competent adversaries.  Joint Decl. ¶ 90; Walco Invs. v. Thenen, 975 F. Supp. 1468, 1472 (S.D. Fla. 1997) (stating that "[g]iven the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser aptitude could have achieved similar results").

### 3.  Class Counsel Achieved a Superb Result

Given the significant litigation risks faced by the Settlement Class here, the Settlement represents an excellent achievement.  Smith Decl. ¶ 19.  Rather than facing more years of costly and uncertain litigation, the Settlement Class Members will receive immediate benefits, be it in the form of the Prospective Relief, the Cash or Non-Cash Benefits, or both.  Joint Decl. ¶ 91. These benefits will not be reduced by (i) the costs of Notice or Settlement administration, (ii) any Incentive Awards, or (iii) attorneys' fees to Class Counsel, as such items will be borne separately by Sprint.  Agreement §§ I(P), II(B), IV(A)-(D), VI(C); Joint Decl. ¶ 91.

### 4.  The Claims Presented Serious Risk

The Settlement here is particularly noteworthy given the combined litigation risks.  Sprint mounted vigorous defenses, fought hard in discovery, and advanced persuasive arguments in

opposing class certification and in denying liability.  Joint Decl. ¶¶ 92-96.  Success under these circumstances represents a great result.  Smith Decl. ¶¶ 11-12.

Consideration of the "litigation risks" factor under <u>Camden I</u> "recognizes that counsel should be rewarded for taking on a case from which other law firms shrunk.  Such aversion could be due to any number of things, including social opprobrium surrounding the parties, thorny factual circumstances, or the possible financial outcome of a case.  All of this and more is enveloped by the term 'undesirable.'"  <u>Sunbeam</u>, 176 F. Supp. 2d at 1336.

Further, "[t]he point at which plaintiffs settle with defendants . . . is simply not relevant to determining the risks incurred by their counsel in agreeing to represent them."  <u>Skelton v. General Motors Corp.</u>, 860 F.2d 250, 258 (7th Cir. 1988), <u>cert. denied</u>, 493 U.S. 810 (1989). "Undesirability" and relevant risks must be evaluated from the standpoint of plaintiffs' counsel as of the time they commenced the suit – not retroactively, with the benefit of hindsight.  <u>Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.</u>, 540 F.2d 102, 112 (3d Cir. 1976); <u>Walco</u>, 975 F. Supp. at 1473.

Prosecuting the Action was risky from the outset.  Joint Decl. ¶ 92.  First, there was the risk that Sprint would invoke the arbitration clause in its standard account agreements.  <u>Id.</u> at ¶ 93.   As Class Counsel are well aware, invocation of an arbitration clause can quickly derail a putative class action.  <u>Id.</u>  The Court need look no further than another recent Sprint case for illustration.  In <u>In re Sprint Premium Data Plan Marketing and Sales Practices Litigation</u>, 2014 WL 202621 (D. N.J. Jan. 15, 2014), Sprint timely moved to compel arbitration and the motion was granted, in essence ending the case.  <u>Id.</u> at *5.  Here, Sprint did not immediately move to compel arbitration, but subsequently attempted to invoke that right, thereby occasioning a significant delay to the progress of the case.  Joint Decl. ¶ 93.  While Plaintiffs successfully

fended off this effort in this Court, there is no guarantee the Eleventh Circuit would have affirmed.  Id. (noting the prior cases in which Class Counsel have prevailed on class action arbitration issues at the District Court level, only to lose on appeal).

Next, Sprint asserted that certification of a nationwide class, consisting of current and former customers from all states should be denied for a variety of reasons.  Joint Decl. ¶ 94.  If there arguments were successful, this litigation would have effectively ground to a halt and this Settlement would not have been achieved.  Id.

Also of significant danger to Plaintiffs' claims was Sprint's assertion of the voluntary payment doctrine.  Id. at ¶ 95.  If Sprint was ultimately successful in proving this defense, most of the Class would have potentially been left with little to no damages.  Id.

Each of these risks, alone, could easily have impeded Plaintiffs' and the Settlement Class' successful prosecution of these claims at trial and in an eventual appeal.  Considered together, the risks demonstrate that Plaintiffs' claims were far from a "sure thing," and that the Settlement represents a superb result.  Joint Decl. ¶ 96.

5.    Class Counsel Assumed Considerable Risk to Pursue This Action on a Pure
         Contingency Basis, and Were Precluded From Other Employment as a Result

In undertaking to prosecute this complex case entirely on a contingent fee basis, Class Counsel assumed a significant risk of nonpayment or underpayment.  Smith Decl. ¶¶ 14-15; Joint Decl. ¶ 97.  That risk warrants an appropriate fee.  Indeed, "[a] contingency fee arrangement often justifies an increase in the award of attorney's fees."  Sunbeam, 176 F. Supp. 2d at 1335 (quoting Behrens, 118 F.R.D. at 548); see also In re Continental Ill. Sec. Litig., 962 F.2d 566 (7th Cir. 1992) (holding that when a common fund case has been prosecuted on a contingent-fee basis, plaintiffs' counsel must be adequately compensated for the risk of non-payment); Ressler,

149 F.R.D. at 656 ("Numerous cases recognize that the attorney's contingent fee risk is an important factor in determining the fee award.").

Public policy concerns – in particular, ensuring the continued availability of experienced and capable counsel to represent classes of injured plaintiffs holding small individual claims – support the requested fee.  Joint Decl. ¶ 98.  In the words of one District Court:

> Generally, the contingency retainment must be promoted to assure representation when a person could not otherwise afford the services of a lawyer. . . . A contingency fee arrangement often justifies an increase in the award of attorney's fees.  This rule helps assure that the contingency fee arrangement endures.  If this "bonus" methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.

Behrens, 118 F.R.D. at 548.

The progress of the Action shows the inherent risk faced by Class Counsel in accepting this case on a contingency fee basis.  Despite Class Counsel's enormous effort in litigating this Action for almost four years, we remain completely uncompensated for the tremendous amount of time invested in the Action, in addition to the expenses we advanced.   Joint Decl. ¶ 99.  Uncompensated expenditures of this magnitude can severely damage or destroy firms of the small size of our firm.   There can be no dispute that this case entailed substantial risk of nonpayment and financial catastrophe for Class Counsel's practice.

The time Class Counsel spent on this case was time that could not be spent on other matters.   Joint Decl. ¶ 100.   Thus, this factor militates strongly in favor of the requested attorneys' fees.  Smith Decl. ¶ 13.

    6.    The Requested Fee Comports With Fees Awarded in Similar Cases

The fee sought here is consistent with, and actually below, the fee typically awarded in similar cases.  Smith Decl. ¶ 22; Joint Decl. ¶ 101.  Legions of decisions have found that a fee of

less than 25% percent is well within the range of a customary fee. See, e.g., Sunbeam, 176 F. Supp. 2d at 1333-34. Indeed, several recent decisions within this Circuit have awarded attorneys' fees up to (or in excess of) thirty percent, confirming the fairness and reasonableness of the much lower percentage fee requested here. Joint Decl. ¶ 101.

"[F]ederal district courts across the country have, in the class action settlement context, *routinely* awarded class counsel fees in excess of the 25 percent 'benchmark,' even in so-called 'mega-fund' cases." Allapattah Servs., Inc. v. Exxon Corp., 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) (emphasis added) (awarding fees equaling 31⅓ percent of settlement fund); In re Lease Oil Antitrust Litig., 186 F.R.D. 403 (S.D. Tex. 1999) (35.1 percent)); see also Gaskill v. Gordon, 942 F. Supp. 382, 387-88 (N.D. Ill. 1996), aff'd, 160 F.3d 361 (7th Cir. 1998) (finding that 33 percent is the norm, and awarding 38 percent of settlement fund); In re Combustion, Inc., 968 F. Supp. 1116 (W.D. La. 1997) (36 percent); In re Crazy Eddie Sec. Litig., 824 F. Supp. 320, 326 (E.D.N.Y. 1993) (33.8 percent); In re Ampicillin Antitrust Litig., 526 F. Supp. 494, 498 (D.D.C. 1981) (45 percent).

Class Counsel's fee request falls within the range of the private marketplace, where contingency fee arrangements often approach or equal forty percent of any recovery. Smith Decl. ¶ 14; see Continental, 962 F.2d at 572 ("The object in awarding a reasonable attorneys' fee . . . is to simulate the market."); RJR Nabisco, Inc. Sec. Litig., Fed. Sec. L. Rep. (CCH) ¶ 94, 268 (S.D.N.Y. 1992) ("[W]hat should govern [fee] awards is . . . what the market pays in similar cases"). And, "[i]n tort suits, an attorney might receive one-third of whatever amount the Plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery." Blum v. Stenson, 465 U.S. 886, 904 (1984) (Brennan, J., concurring); see also Kirchoff v. Flynn, 786 F.2d 320, 323, 325 n.5 (7th Cir. 1986) (noting "40 percent is the customary fee in tort

litigation"); In re Public Serv. Co. of N.M., 1992 WL 278452, *7 (S.D. Cal. July 28, 1992) ("If this were a non-representative litigation, the customary fee arrangement would be contingent, on a percentage basis, and in the range of 30% to 40% of the recovery.").

Class Counsel's fee request is actually below the range of awards in numerous recent cases in this Circuit.  See, e.g., Waters, 190 F.3d 1291 (11th Cir. 1999) (affirming fee award of 33⅓ percent on settlement of $40 million even though most of the fund ultimately reverted to the defendant); In re Friedman's, Inc. Sec. Litig., 2009 WL 1456698 (N.D. Ga. May 22, 2009) (30 percent); In re BellSouth Corp. Sec. Litig., Civil Action No. 1:02-cv-2142-WSD (N.D. Ga. Apr. 9, 2007) (30 percent); In re Cryolife, Inc. Sec. Litig., Civil Action No. 1:02-cv-1868-BBM (N.D. Ga. Nov. 9, 2005) (30 percent).

### 7. The Remaining *Camden I* Factors also Favor Approving the Requested Fee

The remaining Camden I factors likewise support granting Class Counsel's fee request. Smith Decl. ¶ 16-21.  As noted above, the small size of their firm and the major commitment involved, hampered Class Counsel's ability to work on other cases and accept other representations.   Joint Decl. ¶ 102.  Moreover, without adequate compensation and financial reward, cases such as this simply could not be pursued.  Id.  As one court recently recognized, "given the positive societal benefits to be gained from lawyers' willingness to undertake difficult and risky, yet important, work like this, such decisions must be properly incentivized.  The Court believes, and holds, that the proper incentive here is a 30% fee."  Checking Account Overdraft, 830 F. Supp. 2d at 1364.  The record before the Court compels the same outcome in this Action.

## C.   A Lodestar "Cross-Check" Supports the Requested Fee

Because this case involves a common fund and the Eleventh Circuit has provided that the percentage of fund method is the sole method for calculating fees under such circumstances, it is

unnecessary to engage in a lodestar "cross-check."  E.g., Checking Account Overdraft, 830 F.

Supp. 2d at 1362 (noting that after Camden I, the percentage of fund method is the "exclusive"

method for calculating fees in common fund cases in the Eleventh Circuit, "the lodestar approach

should not be imposed through the back door via a 'cross-check,'" and the court "does not need

to see timesheets to know how much work Class Counsel have put in to reach this point").

However, even if a lodestar cross-check is performed in this case, Class Counsel's fee and cost

request is far below the reasonable amount.

> To arrive at a lodestar figure . . ., the district court must first determine the
> number of hours reasonably spent by the plaintiffs' counsel on the matter, then
> multiply those hours by an hourly rate the court deems reasonable for similarly
> complex non-contingent work.  That lodestar figure may then be adjusted upward
> or downward for certain factors known as multipliers, such as contingency and
> the quality of the work performed, to arrive at a final fee.

Camden I, 946 F.2d at 772.  The lodestar cross-check does not entail "mathematical precision or

bean-counting" but rather is intended to gauge the reasonableness of a percentage of fund fee

award.  In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 299 (3d. Cir. 2005) ("district courts may

rely on summaries submitted by the attorneys and need not review actual billing records");

Ingram v. The Coca-Cola Co., 200 F.R.D. 685, 696 (N.D. Ga. 2001) (relying on affidavits of

lead counsel as to hours and rates when conducting lodestar cross-check of percentage of fund

award).

Here, Class Counsel (and others at their firm) have spent in excess of 1,125 hours

pursuing this matter and estimate another 250 hours will likely be necessary to see this matter

(and any related appeals) through to final conclusion.  Joint Decl. ¶¶ 104-05.  Even at their

current billing rates for clients that pay by the hour, this yields a lodestar in excess of $500,000.

Joint Decl. ¶¶ 107-108; also, e.g., Dillard v. Greensboro, 213 F.3d 1347, 1354-55 (11th Cir.

2000) (holding that the moving attorneys' customary billing rates for fee-paying clients is ordinarily the best evidence of market rate).

Applying an upward multiplier of 2.5 to this amount to account for the twelve Johnson factors, most notably the contingency nature of the representation, the difficulty of the relevant questions, and the undesirability of the case (pp. 34-43, supra), is warranted.  E.g., Pinto v. Princess Cruise Lines, Ltd., 513 F. Supp. 2d 1334, 1344 (S.D. Fla. 2007) (citing cases approving multipliers of up to 12 times lodestar and holding that class counsel's fee request, which amounted to a multiplier of less than two, satisfied the lodestar cross-check); Ingram, 200 F.R.D. at 696 (employing application of multiplier between 2.5 and 4 to lodestar amount "considering the [Johnson] factors outlined which support the proposed percentage fee award"); Behrens, 118 F.R.D. at 548-49 ("[t]he range of lodestar multiples in large and complicated class actions runs from a low of 2.26 [] to a high of 4.5.  Most lodestar multiples awarded in cases like this are between 3 and 4"); Mashburn v. Nat'l Healthcare, Inc., 684 F. Supp. 2d 679, 702 (M.D. Ala. 1988) (approving multiplier of 3.122 after applying Johnson factors).  If a reasonable multiplier of 2.5 were imposed, an award of fees and costs well more than double that being sought would be generated.  Joint Decl. ¶ 108.

Here, however, because $500,000 is *less* than Class Counsel's lodestar and does not require any upward modifier, the lodestar cross-check would readily support the requested fee and cost award.  In re Fasteners' Antitrust Litig., 2014 WL 296954, *8 (E.D. Pa. Jan. 27, 2014) (fee award based on a negative multiplier is indicative of the reasonableness of the award).  Thus, even if Camden I did not exclude reference to lodestar, a cross-check would only confirm the request of Class Counsel.

## V.    <u>CONCLUSION</u>

The Settlement with Sprint securing important class-wide Prospective Relief, as well as a minimum common fund of $2.3 million for the Sub-Class, and the payment of all attorneys' fees, incentive awards, and settlement expenses, represents an outstanding result given the obstacles confronted in this litigation.  The Settlement more than satisfies the fairness and reasonableness standard of Rule 23(e), as well as the class certification requirements of Rules 23(a) and (b)(3). Further, Class Counsel's applications for Incentive Awards for the class representatives and for fees and expenses is reasonable under all the circumstances.  The fee request satisfies the guidelines of <u>Camden I</u> given the outstanding result, the notable litigation risks, the extremely complicated nature of the factual and legal issues, and the time, effort, and skill required to litigate claims of this nature to a satisfactory conclusion.  The fee request also measures up under a lodestar cross-check.

Accordingly, Plaintiffs and Class Counsel respectfully request that this Court (1) grant Final Approval to the Settlement; (2) certify for settlement purposes the Settlement Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(e); (3) appoint as class representatives Mr. Barkwell and Mr. Massey; (4) appoint E. Adam Webb and Matthew C. Klase as Class Counsel; (5) approve the requested Incentive Awards for the named Plaintiffs; (6) award Class Counsel attorneys' fees and expenses; and (7) enter Final Judgment dismissing the Action with prejudice.

DATED this 7th day of February, 2014.

Respectfully submitted,

BY:    WEBB, KLASE & LEMOND, LLC

_/s/ E. Adam Webb_____
E. Adam Webb
    Georgia State Bar No. 743910
Matthew C. Klase
    Georgia State Bar No. 141903

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
(770) 217-9950 (fax)

Counsel for Plaintiffs and the Class

**CERTIFICATE OF SERVICE**

I hereby certify that on February 7, 2014, I presented the foregoing to the Clerk of Court

for filing and uploading to the CM/ECF system, which will send a notice to the counsel of record

listed below:

H. Wayne Phears, Esq.
R. Patrick Dover, Esq.
McGuire Woods LLP
1170 Peachtree Street N.E., Suite 2100
Atlanta, Georgia 30309
wphears@mcguirewoods.com
rdover@mcguirewoods.com

DATED this 7th day of February, 2014.

/s/ E. Adam Webb
E. Adam Webb